UNITED STATES DISTRICT COURT        <u>FOR ONLINE PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK

---

JANE DOE,

                      Petitioner,

           - versus -

UNITED STATES OF AMERICA,

                     Respondent.

MEMORANDUM
<u>AND ORDER</u>
14-MC-1412 (JG)

---

A P P E A R A N C E S:

        BERNARD H. UDELL
            26 Court Street
            Brooklyn, New York 11242
            *Attorney for Petitioner*

        KELLY T. CURRIE
            ACTING UNITED STATES ATTORNEY
            Eastern District of New York
            271 Cadman Plaza East
            Brooklyn, NY 11201
        By:    Bradley T. King
            *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

        Jane Doe filed an application on October 30, 2014, asking me to expunge her thirteen-year old fraud conviction because of the undue hardship it has created for her in getting – and especially keeping – jobs.  Doe gets hired to fill home health aide and similar positions only to be fired when her employers learn through subsequent background checks about her conviction.  Since the conviction was for health care fraud, it's hard to blame those employers for using the conviction as a proxy for Doe's unsuitability.

However, even if one believes, as I do, that employers are generally entitled to know about the past convictions of job applicants, and that their decisions based on those convictions are entitled to deference, there will nevertheless be cases in which all reasonable employers would conclude that the conviction is no longer a meaningful consideration in determining suitability for employment if only they had the time and the resources to conduct a thorough investigation of the applicant or employee.

I have conducted such an investigation, and this is one of those cases.  In addition to presiding over the trial in Doe's case and her subsequent sentencing, I have reviewed every page of the extensive file that was created during her five years under probation supervision.  I conclude that the public's interest in Doe being an employed, contributing member of society so far outweighs its interest in her conviction being a matter of public record that the motion is granted and her conviction is expunged.

FACTS

A.      *Doe's Background and Crime*

Doe was born and raised in Port-au-Prince, Haiti.  In 1983, at age 24, she came to New York in search of a better life.  She became a naturalized citizen in 1989.  By 1990 she had three children from a relationship with a taxi driver who in that year left the family to return to Haiti.  Doe's mother had come from Haiti in 1988 to help with the children, but she died in 1995.  Another relationship ended prior to the birth of Doe's fourth child in 1996.

Doe enrolled in a nursing assistant program and became a home health aide.  By 1997, when she first became involved in the criminal conduct that gave rise to her conviction, Doe's children were ages 12, 10, 7, and 1.  She was raising them by herself on her net monthly income of $783.  They lived in a two-bedroom apartment on the first floor of a six-story building in the Jamaica section of Queens.  The monthly rent exceeded Doe's take-home pay.  After

2

visiting the home as part of the presentence investigation, a probation officer reported that crack dealers and crack addicts frequented the entrance to the building and its lobby.

In those circumstances, Doe participated in 1997 in one of the automobile insurance fraud schemes that were ubiquitous in this district at the time. The schemes involved, among other criminal participants: corrupt physicians and other health care professionals at clinics; organizers of staged car "accidents" (who were usually principals of car service businesses); drivers of livery cars, who would deliberately cause minor collisions; and people like Doe, who would climb into the back seat of a car before the staged collisions. A car full of passengers would be deliberately driven into an innocent motorist's car at low speed, often when the latter car was stopped at a light. A police officer was summoned, producing a police report, and the passengers would feign injuries. They were taken to a clinic, where they signed over their rights to no-fault insurance benefits to the clinic. The clinic would then bill the insurance companies for unnecessary (and usually unperformed) services, up to the $50,000 limit. The corrupt clinics would pay the car service operators for each "patient" they provided, the driver would get a fee (usually $500) for causing the "accident," and the passengers in the back of the car would sometimes get a small cash payment. In addition, the phony treatment files generated by the clinics for each of the (uninjured) passengers would sometimes become the basis of particularly audacious personal injury lawsuits. Specifically, the passengers would be referred to lawyers who would bring suits on their behalf against the innocent drivers of the other cars. Of course those suits were entirely meritless (a fact the lawyers sometimes were aware of, and sometimes not), but they could be settled for their nuisance value.

On August 1, 1997, Doe agreed to be involved in one of these staged accidents. She was one of the passengers in the back seat, and she falsely claimed that she was injured,

assigned her no-fault insurance claim to a clinic, and represented that she had received medical services related to her fabricated injury.  A civil claim was filed on her behalf, which was settled, and Doe received $2,500.[1]  In 2001, Doe was found guilty after a jury trial of violating 18 U.S.C. § 1347 based on her role in the scheme.  She was sentenced on March 25, 2002 to five years' probation, ten months of home detention, and a restitution order of $46,701.  She had no prior criminal history, and she has not had any contact with the criminal justice system since her conviction.

B.      *Doe's Employment Problems While on Probation and Afterward*

I have carefully reviewed the Probation Department's files on Jane Doe.  They memorialize the five years she spent under supervision.  The two files total almost 1,000 pages. They paint a portrait of a woman who (1) needs to work to support the four young children she was raising by herself at the time; (2) wants very much to work; (3) detests being on public assistance; and (4) poses no risk of financial harm to others.  Along with the facts advanced in support of the instant motion, the probation files also show that during the 13 years since Doe was sentenced, her conviction has become an increasingly insurmountable barrier to her ability to work.

Early in her five-year probationary period, Doe got a job as a "house manager" at Agency One,[2] a homeless shelter for women with children.  It was not fulltime work, but the combination of her wages from that job, her public assistance, and food stamps equaled

---

[1]     The presentence report (at ¶ 16) asserts that Doe received payments for fraudulent medical expenses totaling $31,201.80, but that money went to the clinic to which Doe had assigned her right to no-fault benefits, not to Doe herself.  Thus, those funds were properly included in Doe's loss calculation under the Guidelines, but they do not represent her gain from her offense.  Rather, the trial record establishes that Doe received a $4,000 payment to settle her lawsuit, of which Doe got $2,500.  Trial Tr. at 20, 950, 958.  (In this respect the trial record contradicts the suggestion in paragraph 16 of the presentence report that Doe received $15,500 in settlement funds from that accident.)  In addition, the government put on evidence at trial of uncharged and allegedly staged accidents involving Doe and two of her children on November 10, 1998, May 9, 2000, and October 23, 2000.

[2]     In an effort to preserve confidentiality, the agencies will not be referred to by their real names.

4

approximately $1,300 per month.  Doe was laid off from that job in July 2003, apparently for reasons unrelated to her conviction.

Doe actively began looking for other work, and in March 2004 she began working as a counselor at Agency Two, a home for families with children with mental disabilities.  The probation officer noted on May 21, 2004 that Doe's supervisor was unaware of her conviction.  Even with the job at Agency Two, Doe's total monthly income was less than $1,000.  At that time her children were ages 17, 16, 13, and 7.

Despite her dire financial circumstances, Doe was intent on keeping up with her restitution obligation.  I had ordered her to pay $25 per month.  The October 2004 notes in the file state that she was actually two months *ahead* in her payments, explaining that "[t]hough she occasionally misses a payment, she doubles the payment the following month," and she apparently doubled her payment on two more occasions than she needed to.

By September 2004, for reasons not set forth in the file, Doe was back on public assistance.  In December of that year she landed a part-time job as a relief counselor at Agency Three, a home for persons with mental illnesses and developmental disabilities.  The job paid $10 per hour, but the hours were so low that Doe's total monthly income (including food stamps) hovered around $600 for three months.  When her hours spiked in May 2005 she had the best month by far of the entire five years of probation, earning $2,248, and she promptly sent $740 of it to her three siblings in Haiti.  In June and July her hours declined, as did her net income, to $1,008 and $1,120, respectively, and by August she was back on public assistance.[3]

---

[3]     Again, the file does not reveal whether this was one of the jobs from which Doe was fired after her conviction was discovered.

A September 14, 2005 note states that Doe reported to her probation officer that she had just gotten a new job. But the job went away, and a two-page handwritten note from Doe to the officer explained what had happened:

> The problem right now. Any placed you fill any application for job you suposed to make fingerprint and background checked. For me, this is the problem. I've applied so many places to work. Everything is O.K. When people calling you for an interview, I fail because fingerprint and criminal background checked came back. People said I'm very sorry for you. I can't hired you because criminal background checked and fingerprint. I'm a patient woman I'm still going to looking for different placed or private duties to do . . . .[4]

Doe kept looking for work and found it at Agency Four, a home for the elderly. The position was not only low-paying (Doe's monthly income for the five months she worked there never reached $1,000), but the employer would not allow Doe to take the time needed to see her doctor for a thyroid condition. As a result, she switched to Agency Five in May 2006. Agency Five is a home health care provider.

The move to Agency Five brought with it the risk of a fingerprint check, and that risk materialized two months later. Doe was fired on July 24, 2006, when her conviction came to light.

The probation officer's report covering July 2006 still has a yellow Post-It note stuck to it. On the note is the following plea from Doe:

> [C]an't you please talk to the judge about my situation, criminal record. If the judge can't release my problem one day I'm going to find work somewhere. I'm good hardworking woman, I'm single parent, have 4 childrens. I don't like welfare I like to work. I'm independence woman please explain to judge for me.

---

[4]    The text of the note is reprinted here exactly as it was written. I note that English is not Doe's native language, and she learned English as her second language only after immigrating to the United States.

The report for August 2006 includes Doe's statement that "right now I'm not working because criminal record."

In October of that year, Doe reported in writing to her probation officer as follows: "When I'm looking for job the criminal background give me a problem.  No job for me nowhere?  Very sadness."

Doe's file reveals that she remained unemployed until her probation was terminated on March 24, 2007.  Since then the pattern has continued.  Specifically, Doe's conviction does not prevent her from getting jobs as a home health care worker, but it has consistently prevented her from keeping those jobs.  She doesn't lie to her employers, who do not ask her if she has a criminal record at the hiring stage.  However, after she gets jobs, record checks are performed by her employers or others acting on their behalf.  Once they learn of Doe's conviction, she gets fired.  This has happened to her half a dozen times.

The government does not dispute any of the foregoing facts.  Rather, it contends in opposition to the motion that Doe's employment difficulties do not amount to the extreme circumstances necessary to warrant expungement.

## DISCUSSION

A conviction for even a minor federal felony can have wide-ranging effects on, among other things, a defendant's employment, housing, and educational opportunities.  Those effects sometimes "impose additional burdens on people who have served their sentences . . . without increasing public safety in essential ways."[5]  And "research reveals that gainful employment and stable housing are key factors that enable people with criminal convictions to

---

[5]     Letter from Attorney General Eric Holder to State Governors (Apr. 18, 2011) ("Holder Letter"), *available at* http://csgjusticecenter.org/wp-content/uploads/2014/02/Reentry_Council_AG_Letter.pdf.

7

avoid future arrests and incarceration."[6]  Simply put, the public safety is better served when people with criminal convictions are able to participate as productive members of society by working and paying taxes.

A criminal record poses an especially high barrier to employment.  Nearly seventy percent of U.S. employers now perform some form of criminal background check on prospective employees.[7]  A criminal record exacerbates the increased difficulty that older workers like Doe already face in the job market.[8]  Those difficulties are further exacerbated by race.  Doe is black, and studies show that her race is even more of an impediment to her employment prospects than her conviction.[9]

The growing concern in recent years about the collateral consequences of criminal records has prompted various efforts to address how the criminal justice system can better balance its law enforcement goals with society's interest in the successful rehabilitation and reentry of individuals with criminal convictions.[10]  For example, in 2011, Attorney General Eric Holder called on the states to review the more than 38,000 statutes and regulations that impose

---

[6]      *Id.* at 2.

[7]      *SHRM Survey Findings: Background Checking – The Use of Criminal Background Checks in Hiring Decisions*, Society for Human Resource Management (Jul. 19, 2012), *available at* http://www.shrm.org/research/surveyfindings/articles/pages/creditbackgroundchecks.aspx (follow "click here" link).

[8]      *See* Maria Heidkamp et al., NTAR Leadership Ctr., Dep't of Labor, *The Public Workforce System: Serving Older Job Seekers and the Disability Implications of an Aging Workforce* 6-9 (May 2012), *available at* http://www.dol.gov/odep/pdf/NTAR_Public_Workforce_System_Report_Final.pdf (discussing how older workers who lose a job have a more difficult time than their younger counterparts in reconnecting to the labor market).

[9]      *See* James B. Jacobs, *The Eternal Criminal Record* 279-80 (Harvard Univ. Press 2015) (discussing sociologists Richard D. Schwartz and Jerome Skolnick's study finding that a criminal conviction produces "status degradation" with potentially permanent effects, and sociologist Devah Pager's more recent study finding that fictitious job applicants who were white with a criminal conviction were more likely to receive interest from employers than black applicants with *no* criminal conviction).

[10]      This concern stems from the rise in arrests and incarceration the last few decades that have left millions of people with a criminal record.  An estimated 65 million Americans have a criminal record and thus face significant barriers to employment.  *See* Michelle Natividad Rodriguez & Maurice Emsellman, Nat'l Employment Law Project, *65 Million "Need Not Apply": The Case for Reforming Criminal Background Checks for Employment* 3 (Mar. 2011), *available at* https://www.nelp.org/content/uploads/2015/03/65_Million_Need_Not_Apply.pdf.

collateral consequences and to eliminate those that do nothing to increase public safety.[11]  In

2014, Chief Judge Jonathan Lippman of the New York Court of Appeals proposed a measure

that would allow nonviolent felons to have their records sealed if they avoid re-arrest for ten

years and have no prior felony convictions.[12]  Two bills that would create federal expungement

authority for nonviolent offenses have been introduced in recent years, although neither

advanced to a floor vote.[13]  Delaware Governor Jack Markell has used his pardon power in an

effort to alleviate the stigma of criminal records and to help deserving individuals secure

employment, signing almost 1,600 pardons, primarily for people convicted of minor offenses, in

his six-plus years in office.[14]  Thus, commendable systemic efforts to correct the long-lasting and

often disproportionate consequences of criminal convictions are under way.

---

[11]     Holder Letter at 2.  The Department of Justice's National Institute of Justice ("NIJ") funded a comprehensive study of collateral consequences by the ABA Criminal Justice Section, and launched a website in September 2012 that inventories the more than 38,000 collateral consequences of criminal records in the country.  *See* ABA National Inventory of Collateral Consequences of Conviction ("NICCC"), http://www.abacollateralconsequences.org/map/.

[12]     *See* Robert Gavin, *Lippman: Expunge Non-Violent Convictions*, Times Union, February 11, 2014, *available at* http://www.timesunion.com/local/article/Lippman-Expunge-non-violent-convictions-5223958.php#page-1; *see also* OCA 2014-98R, *available at* http://newyorksealinglaw.com/wp-content/uploads/2014/03/OCA_2014-98R.pdf (providing the language of the proposed bill).  In 2014, New York Senators Michael F. Nozzilio and Joseph R. Lentol introduced a bill similar to Chief Judge Lippman's proposal.  *See* NYS S9607 (May 12, 2014) & NYS S7926 (July 7, 2014).  The purpose of the bill was to:

> . . . give certain past criminal offenders, i.e., nonviolent individuals whose criminal conduct was so far in the past as to make them statistically no more likely to commit future crime than any other person, a means by which to have their criminal record sealed from public view and thereby to relieve them of some of the economic and social stigma that generally attaches to criminal offenders even after their debts to the community have been paid.

N.Y.S. Senate Introducer's Memorandum in Support of S7926 (July 7, 2014), *available at* http://public.leginfo.state.ny.us (search query: "Bill No.," "A09607," "2014," "Sponsor's Memo"); OCA 2014-98R.

[13]     In 2011, Rep. Charles B. Rangel introduced the Second Chance for Ex-Offenders Act of 2011, H.R. 2449, 112th Cong., and Rep. Steve Cohen introduced the Fresh Start Act of 2011, H.R. 2065, 112th Cong.  Both bills provided for expungement of nonviolent offenses, whether misdemeanors or felonies, for first-time offenders.  *See* Summaries for the Second Chance for Ex-Offenders Act of 2011, *available at* https://www.govtrack.us/congress/bills/112/hr2065/summary; H.R. 2449 – Fresh Start Act of 2011, *available at* https://www.congress.gov/bill/112th-congress/house-bill/2449.

[14]     Cris Barrish & Jonathan Starkey, *Dramatic Rise in Pardons in Delaware*, News Journal, April 25, 2015, available at http://www.delawareonline.com/story/news/local/2015/04/25/dramatic-rise-pardons-delaware/26374339/.

In the meantime, on a case-by-case basis, "expungement lies within the equitable discretion of the court[.]"[15]   District courts in this and certain other circuits have ancillary jurisdiction over applications for orders expunging convictions.[16]   A request for expungement is "usually is granted only in extreme circumstances" after examining it "individually on its merits to determine the proper balancing of the equities."[17]   Specifically, "the government's need to maintain arrest records must be  balanced against the harm" that the records can cause citizens.[18]

---

[15]      *United States v. Schnitzer*, 567 F.2d 536, 539 (2d Cir. 1977), *cert. denied,* 435 U.S. 907 (1978).

[16]      *Id.* at 538 (citing cases).  In 1994, the Supreme Court limited ancillary jurisdiction of collateral proceedings to instances where it is necessary "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent," and "(2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379-80 (1994).  Ancillary jurisdiction allows federal courts to hear "some matters (otherwise beyond their competence) that are incidental to other matters properly before them."  *Id.* at 378.  The federal courts of appeals seem to agree that district courts have ancillary jurisdiction to expunge records of unlawful convictions or arrests.  *See* 13 Charles Alan Wright et al., *Federal Practice & Procedure* § 3523.2 (3d ed. 2008).  They disagree, however, with respect to whether district courts have ancillary jurisdiction where, as here, they are asked to expunge records of lawful convictions based on equitable considerations.  *See id.*  The Second, Fourth, Seventh, Tenth, and D.C. Circuits have held that district courts have subject matter jurisdiction over such applications.  *Id.* (citing *United States v. Flowers*, 389 F.3d 737, 739 (7th Cir. 2004); *Livingston v. U.S. Dep't of Justice*,759 F.2d 74, 78 (D.C. Cir. 1985); *Allen v. Webster*, 742 F.2d 153, 154-155 (4th Cir. 1984); *Schnitzer*, 567 F.2d at 539; *United States v. Linn*, 513 F.2d 925, 927 (10th Cir. 1975)).  The First, Third, Sixth, Eighth, and Ninth Circuits have held otherwise since *Kokkenen*. *See United States v. Lucido*, 612 F.3d 871, 875-76 (6th Cir. 2010); *United States v. Coloian*, 480 F.3d 47, 52 (1st Cir. 2007) ; *United States v. Meyer*, 439 F.3d 855, 859-60 (8th Cir. 2006); *United States v. Dunegan*, 251 F.3d 477, 480 (3d Cir. 2001); *United States v. Sumner*, 226 F.3d 1005, 1014-15 (9th Cir. 2000).  District courts in the Fourth Circuit have also held that they lack ancillary jurisdiction to expunge records on equitable grounds despite the Circuit's holding in *Allen*, 742 F.2d 153. *See, e.g.*, *United States v. Harris*, 847 F. Supp. 2d 828, 831-836 (D. Md. 2012); *United States v. Mitchell*, 683 F. Supp. 2d 427, 430 (E.D. Va. 2010).

      The government has not challenged my jurisdiction to decide Doe's application, but that does not relieve me of my obligation to ensure that such jurisdiction exists.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  I conclude that it does.  As mentioned above, *Kokkonen* acknowledged federal courts' ancillary jurisdiction over proceedings that "enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."  511 U.S. at 380.  A claim of breach of contract – specifically, breach of an agreement that settled a prior federal suit – was held by the Court not to fall within that power.  *Id.* at 380-81 ("The facts to be determined with regard to such alleged breaches of contract are quite separate from the facts to be determined in the principal suit, and automatic jurisdiction over such contracts is in no way essential to the conduct of federal-court business.").

      An expungement proceeding is different in kind.  Its sole focus is the record of the conviction that occurred in this case, and the exercise of discretion it calls for is informed by, *inter alia*, the facts underlying the conviction and sentence and the extensive factual record created while Doe was under this Court's supervision for five years.  And few things could be more essential to "the conduct of federal-court business" than the appropriateness of expunging the public records that business creates.

[17]      *Schnitzer*, 567 F.2d at 539 & 540 (quotation and citation omitted).

[18]      *United States v. Doe*, No. 71-CR-892 (CBM), 2004 WL 1124687, at *2 (S.D.N.Y. May 20, 2004) (quoting *Schnitzer*, 567 F.2d at 539).

Doe seeks the expungement of a valid conviction, not a suspect arrest, and I am acutely aware that "courts have rarely granted motions to expunge arrest records, let alone conviction records."[19]  Nevertheless, courts have granted such requests even where the conviction is valid and no government misconduct was involved as long as sufficiently extraordinary circumstances are present.[20]

This case presents extraordinary circumstances sufficient to warrant expungement.  First, Doe's offense of conviction "is distant in time and nature from [her] present life."[21]  Doe committed the offense 17 years ago, was sentenced 13 years ago, and completed her five-year sentence of probation eight years ago.  She has not even been re-arrested, let alone convicted, in all those years.

Second, Doe has shown that her criminal record has had a dramatic adverse impact on her ability to work.[22]  She has been terminated from half a dozen jobs because of the record of her conviction.  These consequences are compounded in Doe's case by her age and her race.  Indeed, given the well-established fact that recidivism rates decline as age increases,[23] Doe's age alone counsels in favor of expunging her conviction.  That she has not engaged in any

---

[19]     *United States v. Sherman*, 782 F. Supp. 866, 868 (S.D.N.Y. 1991); *see also United States v. McFadzean*, No. 93-CV-25 (CSH), 1999 WL 993641, at *3 (S.D.N.Y. Nov. 2, 2009) (expungement "is not commonly granted even in cases in which the defendant was acquitted of the charges, much less where the defendant has been convicted by a jury or pleaded guilty[.]").

Typically, arrest records have been expunged where there was government misconduct or the conviction was somehow invalid, such as: (1) mass arrests which made the determination of probable cause impossible; (2) arrests effectuated only to harass civil rights workers; (3) police misuse of the records resulting in prejudice to the defendant; and (4) the statute underlying the arrest was later declared unconstitutional.  *Schnitzer*, 567 F.2d at 540 (citations omitted).

[20]     *United States v. Doe*, 935 F. Supp. 478, 480-81 (S.D.N.Y. 1996).

[21]     *See Doe*, 2004 WL at *3 (thirty-year period since conviction weighs in favor of expunging record); *see also Doe*, 935 F. Supp. at 480 (amount of time elapsed since conviction and defendant's conduct during that period were factors counseling in favor of expungement).

[22]     *See Doe*, 2004 WL at *3; *Doe*, 935 F. Supp. at 480-81.

[23]     *See e.g.*, U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 & Ex. 9 (May 2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

criminal activity since the conduct that brought her before me helps to prove that point; a long period of law-abiding conduct after a conviction lowers the risk of recidivism to the same level as someone who has never committed a crime.[24]

       Doe was a minor participant in a nonviolent crime.  As the Supreme Court has made clear, while prison terms are qualitatively more severe, Doe's five-year term of probation was serious punishment.[25]  Moreover, intermediate sanctions, like the ten-month period of home detention with electronic monitoring I imposed upon Doe, can inflict meaningful additional punishment without risking the loss of a defendant's children to foster care.  Anyone who is not persuaded that home detention is real punishment need only review the section of Doe's probation file that is devoted to the home confinement condition. [26]

---

[24]    *See* Alfred Blumenstein & Kiminori Nakamura, Criminology Vol. 47, *Redemption in the Presence of Widespread Criminal Background Checks* Table 2 (May 2009), *available at* http://jrsa.org/webinars/presentations/cch_part2-criminology-2009.pdf (finding, for example, that the risk of recidivism for individuals who committed a burglary or robbery offense at age 20 drops to the same risk level of arrest in the general population 3.2 and 4.4 years, respectively, after the individual has remained crime free).

[25]    *Gall v. United States*, 552 U.S. 38, 48 (2007).  Probationers are subject to myriad conditions of probation that significantly impair their freedom.  They cannot leave their judicial district, move, or change jobs before notifying and getting permission from their probation officer or the court.  *Id.*  They have to report to their probation officers on a regular basis and submit to unannounced home visits.  *Id.*  They must not associate with anyone convicted of a felony and must refrain from excessive drinking.  *Id.*  The court can also impose a variety of "special conditions" that make everyday life extremely difficult to navigate.  *Id.*  And the violation of a condition can be grounds for more onerous modifications of the conditions of supervision or even revocation of supervision and the imposition of a term of incarceration up to two years.

[26]    The goal of home detention is to punish by ensuring the offender leaves the home only for pre-approved good reasons.  Thus, for ten months, Doe needed the advance approval of her supervising officer every single time she wanted to leave her home.  There were some permissions she could obtain in blanket form; for example, the file reflects that during periods of unemployment, she could be out of the home beginning at 7:30 A.M. to bring her children to school, but she had to be back in the home by 9:00 A.M.  She was given permission to leave at 2:30 P.M. to pick them up.

    All other trips outside the home needed to be applied for and approved separately.  Trips to church and the grocery store had to be requested two days in advance.  All the normal tasks of daily life required advanced planning and approval.  On March 24, 2003, for example, Doe got permission to leave the house to take one of her daughters for braces.  Another entry from the previous November memorializes the permission she received to leave the home to do her laundry.

    In addition, Doe was required to complete a personal financial statement and execute authorization forms for credit checks, tax returns, education checks, and the disclosure of her medical record.  There was no detail about her personal life for a five-year period that was not covered by the paperwork in her probation file.  She was regularly subjected to drug tests.  She was directed to submit a sample of her DNA for analysis and entry into the FBI database.

The government's main arguments against expungement are that Doe's circumstances are not sufficiently extreme and that it is entirely appropriate for employers in the health care field to have knowledge of her conviction of health care fraud.[27]  As for the first argument, there is a growing recognition that the adverse employment consequences of old convictions are excessive and counter-productive.  Doe's criminal record has prevented her from working, paying taxes, and caring for her family, and it poses a constant threat to her ability to remain a law-abiding member of society.  It has forced her to rely on public assistance when she has the desire and the ability to work. Nearly two decades have passed since her minor, nonviolent offense.  There is no justification for continuing to impose this disability on her.  I sentenced her to five years of probation supervision, not to a lifetime of unemployment.

The government's second argument, *i.e.*, that Doe's health care fraud conviction should not be expunged because she seeks employment in the health care field, has obvious superficial appeal.  Indeed, if Doe's conviction had arisen out of her work as a home health aide, the outcome of this application might well have been different.  But facts matter, and the facts here are that a young woman raising four children by herself on wages that did not even cover the rent availed herself of an opportunity to make $2,500 illegally.  That the scheme offered to her resulted in health care fraud was essentially fortuitous.  In her circumstances at the time, Doe would have participated in any scheme to make ends meet.  There was no specter at the time that

---

Another section of the probation file records the innumerable home and community contacts that are regular incidents of community supervision.  Supervising probation officers came to her home regularly, always in pairs, and always unannounced.

In short, there is no sense in which expunging the record of Doe's conviction so that she can retain employment minimizes the punishment she faced for committing her crime.

[27]      The government correctly notes that courts have traditionally declined to expunge records based on adverse employment consequences alone.  *See* Resp. Br. at 5 (citing *United States v. Barrow*, No. 06-CR-1084 (JFK), 2014 WL 2011689, at *1 (S.D.N.Y. May 16, 2014); *Joefield v. United States*, No. 13-MC-367 (JBW), 2013 WL 3972650, at *1 (E.D.N.Y. Aug. 5, 2013); *Oyebola v. United States*, No. 10-MC-425 (JG), 2010 U.S. Dist. LEXIS 72587 (E.D.N.Y. July 20, 2010)).

she had used her training as a home health aide to help commit or cover up her crime.  There is

no specter now that she poses a heightened risk to prospective employers in the health care field.

    Finally, there is something random and senseless about the suggestion that Doe's

ancient and minor offense should disqualify her from work as a home health aide.  The

patchwork quilt of collateral consequences mentioned above produces results that are so

anomalous they border on the farcical.  For example, a conviction for even a minor crime can

result in disqualifying a person from being a barber in New York.[28]  Yet last year the IRS re-

certified a tax preparer despite its knowledge of his recent felony conviction in my courtroom for

preparing a fraudulent tax return for a major drug trafficker.[29]  In that case, the United States

Attorney urged me to allow the defendant to continue to work as a tax preparer without any

notice to his clients of his recent conviction for being a fraudulent tax preparer.  The

government's assertion in this case that the public interest requires home health care agencies to

know about Doe's minor criminal conduct in 1997 thus rings somewhat hollow.

## CONCLUSION

    Doe is one of 65 million Americans who have a criminal record and suffer the

adverse consequences that result from such a record.  Her case highlights the need to take a fresh

look at policies that shut people out from the social, economic, and educational opportunities

they desperately need in order to reenter society successfully.

    The seemingly automatic refusals by judges to expunge convictions when the

inability to find employment is the "only" ground for the application have undervalued the

critical role employment plays in re-entry.  They are also increasingly out of step with public

---

[28] *See* N.Y.S. Dep't of State Div. of Licensing Law, Practice of Barbering License Law §432 (Nov. 2014), *available at* http://www.dos.ny.gov/licensing/lawbooks/barber.pdf.

[29] The name and docket number of this case will be filed separately under seal so as not to make public the individual involved.

opinion.  The so-called "ban the box" practice, in which job applications no longer ask the applicant whether he or she has been convicted of a crime, is becoming more prevalent.[30]  There is an increasing awareness that continuing to marginalize people like Doe does much more harm than good to our communities.

Accordingly, Doe's application for an order expunging her conviction is granted. It is hereby ordered that the government's arrest and conviction records, and any other documents relating to this case, be placed in a separate storage facility, and that any electronic copies of these records or documents and references to them be deleted from the government's databases,  electronic filing systems, and public record.  Doe's real name is to be removed from any official index or public record.  It is further ordered that the records are not to be opened other than in the course of a bona fide criminal investigation by law enforcement authorities and only when necessary for such an investigation.  The government and any of its agents may not use these records for any other purpose, nor may their contents be disseminated to anyone, public or private, for any other purpose.

Finally with respect to the relief granted here, I welcome the input of the parties. My intention is clear: no inquiry of the federal or state government by a prospective employer should result in the disclosure of Doe's conviction.  Effectuating that intent without unduly burdening those governments or impairing their legitimate law enforcement interests is not so clear, at least not to me.  Thus I welcome any proposed modifications to the relief set forth

---

[30]     Marianne Levine, *Koch Industries to Stop Asking About Job Candidates' Criminal History*, Politico.com (Apr. 27, 2015), http://www.politico.com/story/2015/04/koch-industries-brothers-criminal-history-job-applicants-ban-the-box-117382.html.  In 2014, Delaware and Nebraska passed "ban the box" legislation for most state, city and county jobs.  Jeffrey Stinson, *A Criminal Record May No Longer Be A Stumbling Block To Employment In Some Places*, Huffington Post (May 22, 2014), http://www.huffingtonpost.com/2014/05/22/criminal-record-employment_n_5372837.html.  In doing so, they joined at least ten other states and the District of Columbia, which have passed similar legislation since 1998.  *Id.*

above, and of course any such proposals by the government would not be regarded as a waiver of

its opposition to my decision to expunge the conviction.

So ordered.


John Gleeson, U.S.D.J.

Dated: May 21, 2015
       Brooklyn, New York